**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No.  CR 23-00389-TUC-JCH (EJM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Michael Leroy Witt, | |
| Defendant. | |

Pending before the Court is the defendant's Amended Motion to Suppress Evidence based on a lack of a reasonable suspicion to stop his vehicle.  (Doc. 73.)  The defendant argues that the stop was based entirely on an alert on his vehicle that either did not exist, was expired, or was never confirmed by the agent prior to performing the stop.  In the absence of credible evidence regarding the purported alert, the only other factors articulated by the agent for the stop – the defendant's route of travel, his driving behavior, and the dark tint on his rear windows – do not establish a reasonable suspicion for the stop.  The government argues that the alert – which existed, was not expired, and was confirmed by the agent prior to the stop – coupled with these other factors provided a reasonable suspicion for the stop.  For the reasons discussed below, it is recommended that the District Court deny the motion.

## FACTUAL BACKGROUND

On February 20, 2023, the defendant, Michael Leroy Witt, was arrested for alien smuggling.  (Doc. 1.)  A criminal complaint dated February 21, 2023, charged him with transportation of illegal aliens for profit while placing the life of any person in jeopardy.

On March 22, 2023, a federal grand jury in Tucson, Arizona returned a four-count indictment charging the defendant with the following offenses:  Assault on a Federal Officer (Count One); Conspiracy to Transport Illegal Aliens for Profit Placing in Jeopardy the Life of Any Person; (Count Two); and Transportation of Illegal Aliens for Profit Placing in Jeopardy the Life of Any Person (Counts Three and Four).

The defendant filed a Motion to Suppress arguing that the Border Patrol agent did not have reasonable suspicion to stop his vehicle.  The defendant argues that the stop was based, in part, on innocuous facts that apply to large segments of the population:  the heavy tint on the rear windows of his vehicle, even though Arizona law does not restrict the tint level on rear windows; his route of travel, even though he was driving on a road used to get to several tourist destinations; driving 40–45 miles per hour in a 65 miles per hour zone, even though the speed limit had just increased from 35 miles per hour; and his vehicle being registered out of Tucson, even though residents of Tucson routinely travel south to areas near the international border.  The defendant also argues that the information about his vehicle passing through several Border Patrol checkpoints during the prior week does not support reasonable suspicion because there are many reasons why a Tucson resident would travel in southern Arizona and pass through checkpoints.  Finally, the defendant argues that the TECS alert on his vehicle either did not exist, was expired, or was based on inaccurate information, and therefore, should not be considered in the reasonable suspicion analysis.

The government argues that the defendant attempts to assign an innocent explanation to each fact that went into the agent's reasonable suspicion analysis even though the law is clear that a fact cannot be viewed in isolation.  The government argues that when the facts, even the innocuous facts, are viewed in combination, there was reasonable suspicion to stop the defendant's vehicle.

The Court held an evidentiary hearing on the Motion to Suppress on May 7, 2024, and May 20, 2024.  Three witnesses testified:  Border Patrol Agent Gonzales; Border Patrol Agent Eppley; and Victor Valdez, an investigator with the Federal Public Defender's

1   Office.  Their testimony is set forth below.

2       <u>Border Patrol Agent Gonzales</u>

3       Direct Examination:

4       Thomas Jose Gonzales has been employed as an agent with the United States Border
5   Patrol Service for six years.  (Hr'g Tr. 5/7/2024 at 5, Doc. 101.)  He is currently a Patrol
6   Agent and K-9 Detection Handler.  (*Id*.)  His primary job duty is "to prevent illegal entry
7   and alien smuggling in between the ports of entry."  (*Id*.)  He initially attended the Border
8   Patrol Training Academy where he received instruction on "physical techniques, law,
9   driving, firearms," and "training specific to alien smuggling events."  (*Id*. at 6.)  He takes
10   yearly refresher classes on these subject areas.  (*Id*.)

11       Prior to starting a shift, Agent Gonzales attends a morning "muster" where agents
12   are given information on alien smuggling trends and any updates on policy changes.  (Hr'g
13   Tr. 5/7/2024 at 6–7, Doc. 101.)  Agent Gonzales has made between 30 and 50 arrests for
14   alien smuggling during his career.  (*Id*. at 7.)

15       On February 20, 2023, Agent Gonzales was conducting mobile interdiction at the
16   crossroads of State Route ("SR") 82 and SR 83 which is in the Sonoita area of
17   responsibility.  (*Id*. at 7.)  Specifically, he was "seeking out alien smuggling" or other
18   criminal activity north of the border.  (*Id*.)  Agent Gonzales patrols that area in Sonoita
19   every time he works a shift.  (*Id*. at 7–8.)  He described Sonoita as "a small rural
20   community" with a lot "of cattle, grasslands, [and] . . . mountain terrain."  (Hr'g Tr.
21   5/7/2024 at 9, Doc. 101.)  He believes that the population of Sonoita is between two-
22   thousand and three-thousand people.  (*Id*.)

23       SR 82 starts in Nogales, Arizona, at the border between the United States and
24   Mexico and dead ends at the intersection of SR 80 (which runs north and south) near
25   Tombstone, Arizona.  (*Id*. at 11.)  Sonoita is about 32 miles from Nogales, Arizona.  (*Id*.)
26   SR 80 runs southbound through Tombstone and into Douglas, Arizona, and runs
27   northbound into Benson where it intersects with Interstate 10.  (*Id*. at 12.)  Interstate 10
28   runs west through Tucson and Phoenix and into California; it runs east through New

Mexico to the East Coast.  (Hr'g Tr. 5/7/2024 at 12, Doc. 101.)

During his employment with the Border Patrol, Agent Gonzales has "encountered individuals who are smuggling contraband traveling up toward Tucson[.]"  (*Id*. at 13.)  He has seen drivers who were smuggling contraband take indirect routes to avoid Border Patrol checkpoints.  (*Id*. at 17.)  The most direct route from Nogales to Tucson is Interstate 19.  (*Id*. at 13.)  The Border Patrol checkpoint on Interstate 19 in the Tubac/Amado area is "regularly manned by Border Patrol Agents[.]"  (*Id*.)  Travelling to Tucson via SR 82 and SR 80 would take an hour-and-a-half longer than taking Interstate 19.  (Hr'g Tr. 5/7/2024 at 14, Doc. 101.)

The most direct route from Sonoita to Interstate 10 is SR 83 which runs northbound from SR 82.  (*Id*.)  There is a Border Patrol checkpoint located on SR 83 at mile marker 42 which is frequently manned by Border Patrol agents.  (*Id*. at 15.)  Traveling on SR 82 (east) and SR 80 (north) to get to Interstate 10 would add an hour to the trip.  (*Id*. at 14–15.)  SR 90, which runs north and south and intersects with SR 82, would also be a more direct route to Interstate 10 than driving further east to SR 80.  (*Id*. at 15–16.)  There is a Border Patrol checkpoint on SR 90 that is also frequently manned by Border Patrol agents.  (Hr'g Tr. 5/7/2024 at 16, Doc. 101.)  There are no Border Patrol checkpoints "on the route from State Route 82 to State Route 80 to I-10[.]"  (*Id*.)  There was a checkpoint on SR 80 just north of Tombstone, but it remains temporary closed because of an accident.  (*Id*.)  Agent Gonzales believes that this checkpoint had been closed months prior to February 20, 2023.  (*Id*. at 17.)

When Agent Gonzales encountered the defendant on February 20, 2023, Agent Gonzales was stationary in an unmarked vehicle.  (*Id*. at 19.)  He was parked to the west of the Border Patrol station on SR 82 and before the turnoff onto SR 83.  (Hr'g Tr. 5/7/2024 at 19–20, Doc. 101.)  His vehicle was facing eastbound.  (*Id*. at 21.)  Agent Gonzales saw in his rearview mirror a Chevrolet Sonic driving eastbound on SR 82.  (*Id*. at 20.)  He could see the driver and that there was no passenger in the front seat.  (*Id*. at 23.)  As the vehicle passed Agent Gonzales, he could not see through the rear windows of the Sonic because

they were heavily tinted.  (*Id*.)  Although it is legal to have tinted windows in Arizona, it is uncommon to see vehicles with "little to no tint" on the front windows and heavy tint on the back windows.  (Hr'g Tr. 5/7/2024 at 23–24, Doc. 101.)  Agent Gonzales is familiar with local traffic in this area of Sonoita and had not previously seen the Sonic in the area.  (*Id*. at 20–21.)

As Agent Gonzales was following the Sonic, he observed a "[f]luctuation in speed and also bouncing in between the lines left to right."  (*Id.* at 24.)  The speed limit where Agent Gonzales first saw the Sonic on SR 82 is 35 miles an hour.  (*Id*. at 25.)  The speed limit increases to 65 miles an hour at the east end of town.  (*Id*.)  Local residents usually increase their speed to 65 miles per hour once they exit the town limits and enter the 65 mile an hour speed limit zone.  (Hr'g Tr. 5/7/2024 at 26, Doc. 101.)  When the Sonic was in the 65 miles per hour zone, it was travelling about 45 miles an hour.  (*Id*. at 25.)  Driving twenty miles under the speed limit indicated to Agent Gonzales that the driver was "[n]ot familiar with the area or just wanted to drive slow[.]"  (*Id.*)

Agent Gonzales "reached out to sector dispatch to rerun the plate."  (*Id*.)  Agent Gonzales explained that he had previously run records checks on the Sonic using his government-issued cell phone.  (*Id*. at 26.)  He used a secure application called Mobile Query to run the Sonic's license plate number to obtain the name and address of the registered owner of the Sonic and information on any checkpoints that the Sonic passed through.  (Hr'g Tr. 5/7/2024 at 26–27, Doc. 101.)  Agent Gonzales explained that there are license plate readers at the checkpoints that capture license plate information even if a vehicle is not stopped at the checkpoint and even if the checkpoint is not operational.  (*Id*. at 29, 31.)

The Mobile Query on the Sonic revealed that it was registered "to a female out of Tucson, Arizona."  (*Id*. at 27.)  Agent Gonzales found it suspicious that a vehicle registered at an address in Tucson was "driving eastbound towards Sierra Vista/Tombstone area."  (*Id*.)  The Mobile Query also revealed that within the last week the Sonic had passed through four checkpoints.  (*Id*. at 27–28.)  Specifically, on February 19, 2023, the Sonic

passed through the checkpoint on I-19; on February 18, 2023, the Sonic passed through the Wilcox checkpoint on SR 80; and on February 14 and 16, 2023, the Sonic passed through the Tombstone checkpoint on SR 80 which was not operational.  (Hr'g Tr. 5/7/2024 at 31–32, Doc. 101.)  Agent Gonzales found the Sonic's route of travel suspicious because the Sonic was going out of its way to travel to SR 80 to go back north to Tucson.  (*Id*. at 32.)

The Mobile Query also revealed that on February 15, 2023, an alert was placed on the Sonic by Border Patrol Agent Eppley.  (*Id*. at 32–33.)  The alert detailed that the Sonic was registered to Hailey Sternala[1] at an address in Tucson.  (*Id*. at 35.)  The narrative in the alert stated:  "Vehicle is being used to transport illegal aliens from Nogales into the interior of the United States."  (*Id*. at 35–36.)  After gathering this information from Mobile Query, Agent Gonzales began to follow the Sonic.  (Hr'g Tr. 5/7/2024 at 36, Doc. 101.)  Agent Gonzales then reached out to dispatch to verify the information and to let other agents know that he was following the Sonic.  (*Id*.)  Dispatch provided the registered owner's information and ran a query on an Arizona Department of Transportation database.  (*Id.*)  The query revealed that the Sonic was seen on a highway camera around 2:00 p.m. that day travelling on I-10 southbound through Casa Grande (which is about halfway between Tucson and Phoenix).  (*Id*. at 36–37.)  Agent Gonzales first saw the Sonic in Sonoita at about 3:45 p.m.  (*Id*. at 37.)  It takes about an hour to get from Sonoita to Casa Grande on SR 83 northbound to I-10.  (Hr'g Tr. 5/7/2024 at 38, Doc. 101.)

The fact that the Sonic was seen in Casa Grande earlier in the day and travelling on SR 82 later that day was indicative of a "typical smuggling route from Phoenix" by making "a loop around and go back to Tucson or Phoenix."  (*Id*.)  Agent Gonzales has encountered individuals smuggling aliens who have taken that route.  (*Id*.)

Agent Gonzales again testified that when he first saw the Sonic, he was parked on SR 82 before the turnoff to get onto SR 83.  (*Id*. at 38–39.)  The Sonic had passed the turnoff for SR 83 by the time Agent Gonzales reviewed the Mobile Query results.  (*Id*. at 39.)  Agent Gonzales decided to initiate a traffic stop by activating his emergency lights

---

[1] Agent Eppley's testimony reflects a phonetic pronunciation of Sternella.

and sirens.  (Hr'g Tr. 5/7/2024 at 39, Doc. 101.)  The driver of the Sonic put on the emergency flashers and moved to the south shoulder of SR 82 while still travelling eastbound.  (*Id*.)  The driver slowed down but did not stop the vehicle.  (*Id*. at 40.)  The driver lowered the front window and motioned with his left hand for Agent Gonzales to pass.  (*Id*.)  Agent Gonzales found the driver's behavior to be suspicious because it was unusual for a person to "tell an emergency vehicle to pass them by as they're still moving." (*Id*. at 40–41.)  That driving behavior continued for about a quarter of a mile until Agent Gonzales got onto his loudspeaker and instructed the driver to pull over.  (Hr'g Tr. 5/7/2024 at 41, Doc. 101.)  At that point, the driver stopped the vehicle.  (*Id*. at 41.)  This was the initial stop relevant to the present motion; however, Agent Gonzales testified that a second stop occurred after the driver started driving again and "drug [him] down the road about 50 yards" until he was able to turn off the vehicle.  (*Id*. at 42.)

Cross-examination:

Agent Gonzales agreed with counsel that SR 82 is "considered a scenic route" which leads to areas like Patagonia which are visited by tourists.  (*Id*. at 44.)  He also agreed that SR 82 is used by many people and that it connects with other roads that lead to Tucson, Nogales, and Tombstone.  (*Id*.)  As a result, he agreed that "just because someone uses SR-82 doesn't necessarily mean that they're engaging in illegal activity[.]"  (Hr'g Tr. 5/7/2024 at 46, Doc. 101.)  Agent Gonzales does not know all the cars owned by the 2,000 to 3,000 residents of Sonoita.  (*Id*.)  However, he has "a good idea" of the cars that belong to people who live in Sonoita.  (*Id*. at 47.)

Agent Gonzales agreed that dark window tint does not "necessarily mean that people want to conceal something illegal[.]"  (*Id*. at 48.)  He agreed that dark tint is used to reduce the amount of sunlight or heat that comes into a vehicle.  (*Id*.)  Agent Gonzales confirmed that the first thing he noticed about the Sonic was the dark tint because he could not see into the rear windows.  (Hr'g Tr. 5/7/2024 at 49, Doc. 101.)

Agent Gonzales did not note in his report the distance between his car and the Sonic when he first saw the Sonic, that he was facing eastbound, or the distance between the

1   Sonic and his vehicle when he decided to follow it.  (*Id*. at 49–50.)  He also did not indicate
2   when he noticed the Sonic's driving behavior.  (*Id*. at 50.)

3       Agent Gonzales again testified that he was in an unmarked vehicle which had no
4   markings that would "signify to individuals the specific agency that the vehicle might
5   belong to[.]"  (*Id*. at 51.)  He again testified that the Sonic was travelling between 40–45
6   miles per hour when he was following it.  (*Id*.)  The speed limit at mile marker 32 on SR
7   82 is 35 miles per hour because it is a business area.  (Hr'g Tr. 5/7/2024 at 52, Doc. 101.)
8   The Sonic was going 40–45 miles per hour in a 65 miles per hour zone which starts at mile
9   marker 33.  (*Id*.)  Agent Gonzales confirmed that the Sonic was swaying as he followed it.
10  (*Id*. at 55.)  Agent Gonzales was "a good vehicle or two" behind the Sonic; however, he
11  did not note that fact in his report.  (*Id*. at 56.)  Agent Gonzales ran the Sonic's license plate
12  "over sector dispatch."  (*Id*.)

13      Prior to the Mobile Query search on his cell phone. Agent Gonzales did not have
14  any information about the Sonic.  (Hr'g Tr. 5/7/2024 at 57, Doc. 101.)  He was not informed
15  of undocumented immigrants in the area or any other suspicious activity.  (*Id*.)  He was
16  also not told to be on the lookout for a specific vehicle.  (*Id*.)

17      Agent Gonzales agreed that he does not issue traffic tickets and cannot stop a vehicle
18  for a traffic violation.  (*Id*. at 58.)  Agent Gonzales testified that he had a "reasonable
19  suspicion that criminal activity was afoot" based on the traffic violations and the
20  information that he received after he ran the Sonic's license plate.  (*Id*.)  Agent Gonzales
21  agreed that there was no information that the Sonic was stolen; the information was that
22  the Sonic was being used to smuggle aliens.  (Hr'g Tr. at 60, Doc. 101.)  He reached out to
23  sector dispatch to corroborate the information that he obtained via Mobile Query.  (*Id*.)
24  Agent Gonzales agreed that the recording of his communications with dispatch does not
25  contain information about the Sonic's license plate or that the Sonic was seen in Casa
26  Grande at 2:00 p.m. that day; the recording only reflects that the Sonic was seen in Casa
27  Grande.  (*Id*. at 62–65.)  Agent Gonzales is certain that he got the information about the
28  Sonic being seen in Casa Grande at 2:00 p.m. because he would not have put that specific

information in his report.  (*Id.* at 66.)  It is possible that the information from dispatch about the Sonic's license plate was in an email.  (*Id.* at 63.)  The defense noted that it has not been provided with any such email and the government represented that it was not in possession of such an email.  (Hr'g Tr. 5/7/2024 at 63, Doc. 101.)

Agent Gonzales agreed with counsel that his memory of the traffic stop was very clear on the day of the stop and that he includes important details about traffic stops in his reports.  (*Id.* at 68.)  He agreed that his report reflects that he first saw the Sonic at 3:54 p.m. on February 20, 2023, and then at 3:57 p.m. he decided to stop the Sonic.  (*Id.* at 68.)  Within those three minutes, Agent Gonzales was able to run the Mobile Query, make his pertinent observations about the vehicle and driving behavior, and initiate the traffic stop.  (*Id.*)

Agent Gonzales again testified that he activated his vehicle's lights and siren to initiate the stop.  (*Id.* at 69.)  The Sonic slowed down, put on its flashers, and the driver waved for him to pass.  (Hr'g Tr. 5/7/2024 at 69, Doc. 101.)  Agent Gonzales testified that there is a pullout at mile marker 34; but he agreed with counsel that there is not a pullout prior to that mile marker.  (*Id.* at 70.)  The Sonic only stopped when Agent Gonzales used a loudspeaker to tell the driver to stop.  (*Id.* at 72.)

Agent Gonzales disagreed with counsel that he decided to follow the Sonic after he first saw it.  (*Id.*)  He explained that he first saw the Sonic (with a single occupant) in his rearview mirror heading toward him on SR 82.  (*Id.* at 73.)  He ran the Sonic's license plate in Mobile Query when it passed him.  (Hr'g Tr. 5/7/2024 at 72–74, Doc. 101.)  The information received from the query caused Agent Gonzales to follow the Sonic.  (*Id.* at 75.)  That information was the Sonic's four recent crossings at Border Patrol checkpoints, the alert on the Sonic placed by Agent Eppley, and the registered owner of the Sonic and her address.  (*Id.* at 75–76.)

Based on this sequence of events, defense counsel asked Agent Gonzales to identify where in his report it states that he began to follow the Sonic after he got the information from the Mobile Query.  (*Id.* at 78.)  After reviewing his report, Agent Gonzales testified

that "[i]t doesn't say I followed it at all, but obviously I was, as you read through this, and it said I ran the license plate on my Government-issued cell phone." (*Id.* at 79.)

Re-direct examination:

The 65 miles per hour zone starts at mile marker 33 on SR 82. (Hr'g Tr. 5/7/2024 at 80, Doc. 101.) The Sonic's speed when it crossed into that zone was between 40–45 miles per hour. (*Id.*) Prior to running the Mobile Query, Agent Gonzales had noticed the dark tint on the rear windows of the Sonic when it passed his location. (*Id.* at 80–81.) He found the dark tint suspicious because he could not see through it. (*Id.* at 81.) He also did not recognize the Sonic from "local traffic" which he also found suspicious. (*Id.*) Agent Gonzales again testified that the information from Mobile Query revealed that the Sonic had been "sighted within the past few days" at the I-19 checkpoint and the checkpoint on SR 80 near Tombstone, and that the Sonic was registered out of Tucson. (Hr'g Tr. 5/7/2024 at 81–82, Doc. 101.)

With respect to his later call to dispatch, Agent Gonzales testified that he is not required to corroborate the information that he received from Mobile Query. (*Id.* at 82.) He explained that dispatch may have additional information, which in this case was that the Sonic was sighted in Casa Grande. (*Id.* at 82–83.)

The Court's questions:

Agent Gonzales had "already reached out to sector dispatch" before he turned on his vehicle's lights and siren. (*Id.* at 84.) With respect to the Sonic's swerving between lanes, Agent Gonzales explained that "where it hits 65, it's just a two-lane road, so no more turning lane. It's one lane westbound, one lane eastbound. So basically crossing over that lane into the shoulder white line as well, bouncing back and forth like a pinball." (*Id.* at 84.) The swerving and swaying occurred after the Sonic exited the town of Sonoita. (Hr'g Tr. 5/7/2024 at 84, Doc. 101.)

Agent Gonzales was initially stationary at mile marker 32. (*Id.* at 85.) At mile marker 33, the Sonic was "not picking up speed to the posted 65-mile-an-hour zone and then swerving from left to right in between the lane." (*Id.*) At mile marker "34-and-a-

quarter," Agent Gonzales attempted to stop the Sonic.  (*Id*. at 86.)  He explained that "[t]here is a nice dirt spot on the south shoulder that you can pull in there."  (*Id*.)  When the driver of the Sonic put on its hazard lights and was waving for Agent Gonzales to pass, the Sonic was in the shoulder of the road and Agent Gonzales was still within the lane behind the Sonic.  (Hr'g Tr. 5/7/2024 at 86–87, Doc. 101.)  That behavior continued for about a quarter of a mile.  (*Id*. at 87.)

Finally, the Court turned to Agent Gonzales' report.  The Court noted that the narrative of the report, if read chronologically, appears to suggest that Agent Gonzales conducted the Mobile Query after he observed the erratic driving behavior (*e.g.*, driving well under the speed limit and swerving).  (*Id*. at 90.)  Agent Gonzales agreed that the report could be read that way but that is not what happened.  (*Id*.)  He explained that he does not conduct a Mobile Query on his phone while driving.  (*Id*.)

<u>Border Patrol Agent Eppley</u>

Direct Examination:

Jeremy Eppley has been an agent with the United States Border Patrol for 19 years.  (Hr'g Tr. 5/20/2024 at 6, Doc. 108.)  Agent Eppley attended and graduated from the Border Patrol Academy in 2005.  (*Id*. at 7.)  He received training specific to alien smuggling events.  (*Id*.)  Agent Eppley is currently the acting intelligence supervisor over the Sonoita Intelligence Unit.  (*Id*. at 6.)  That position "entails tracking and determining what the tactics, trends, and procedures "that are being used by alien smugglers and illegal aliens that are traversing" the Sonoita area of responsibility.  (*Id*.)  Agent Eppley has made numerous arrests for alien smuggling during his career.  (Hr'g Tr. 5/20/2024 at 7, Doc. 108.)

On February 15, 2023, Agent Eppley was on duty and assigned to the Nogales Intelligence Unit which was conducting anti-smuggling operations.  (*Id*. at 8.)  He and other agents "were targeting the motels in Nogales," most of which are on Grand Avenue about "three quarters of a mile to two miles north of the international border."  (*Id*. at 9.)  Grand Avenue connects directly to the port of entry in Nogales, Arizona.  (*Id*.)  Agent Eppley's

unit was conducting surveillance of the motels because they "had been encountering multiple events in the previous months . . . where both aliens and drivers were being stored at these motels until they were ready to be transported further into the interior of the United States." (*Id*.)  Agent Eppley's unit had been conducting surveillance at that location for a couple months prior to February 2023.  (Hr'g Tr. 5/20/2024 at 9–10, Doc. 108.)  "[T]here w[ere] at least one to two events every week during that timeframe." (*Id*. at 10.)

During his shift on February 15, 2023, Agent Eppley saw a Chevy Sonic at one of the hotels that he was monitoring.  (*Id*.)  Specifically, Agent Eppley saw the Sonic pull out from a hotel parking lot onto Grand Avenue.  (*Id*.)  Agent Eppley was about 10 to 20 yards from the Sonic.  (*Id*.)  Agent Eppley described the Sonic as a black small sedan.  (Hr'g Tr. 5/20/2024 at 10, Doc. 108.)  Agent Eppley ran a query of the Sonic's license plate number and learned that it was registered out of Tucson.  (*Id*. at 11.)  Agent Eppley found the registration information suspicions because in his "experience, generally somebody out of Tucson would travel that extra hour to come back to Tucson rather than stay at one of the motels in Nogales." (*Id*.)

The query also revealed that the Sonic "had passed some license plate cameras on the previous day." (*Id*. at 12.)  Specifically, the previous day the Sonic had both passed through the Border Patrol checkpoint on SR 80 near Tombstone and was captured by a highway camera in the Phoenix area.  (*Id*. at 13–14, 43.)  That information suggested to Agent Eppley that the Sonic had been using a route to circumvent the I-19 checkpoint. (Hr'g Tr. 5/20/2024 at 14, Doc. 108.)  Agent Eppley explained that the "Interstate 19 checkpoint is one of the few checkpoints in the Tucson sector that is almost permanently open and running traffic," whereas the checkpoints to the east of Nogales are not always open.  (*Id*. at 15.)  "[A]s a tactic, multiple drivers and illegal aliens themselves drive out [SR 82] and pass up either to Highway 83, Highway 80, or Highway 90, and depending on which one of those is not open at the time," using one of those routes to get around the Interstate 19 checkpoint to get to Tucson or Phoenix.  (*Id*.)

Agent Eppley attempted to follow the Sonic but was not able to do so.  (*Id*.)  He

then "placed an alert in the Treasury Enforcement Communication System" ("TECS") for the Sonic.  (*Id*. at 15–16.)  As a result, if an agent were to run a query of the Sonic's license plate number in the TECS database, the agent would see Agent Eppley's alert.  (Hr'g Tr. 5/20/2024 at 16, Doc. 108.)  With respect to the categories of information included in the TECS alert, Agent Eppley explained that the following information was prepopulated:  the date of entry of the alert; his name, the agency, and the agency phone number.  (*Id*. at 17.)  Agent Eppley manually entered the Sonic's license plate, the VIN, a description of the vehicle, the registered owner's name and address, and the basis for the alert – *i.e.*, "vehicle is being used to transport illegal aliens from Nogales into the interior of the United States."  (*Id*. at 18.)

Agent Eppley did not write a report based on his encounter with the Sonic on February 15, 2023.  (*Id*. at 19.)  He explained that he typically does not write a report when placing a TECS alert.  (*Id*.)  He wrote a report in November 2023 at the request of the U.S. Attorney's Office.  (Hr'g Tr. 5/20/2024 at 19, Doc. 108.)  His report was based partly on his recollection of the encounter with the Sonic.  (*Id*.)  However, he also ran another query on the Sonic's license plate number to refresh his memory.  (*Id*. at 19–20.)

Cross-examination:

Agent Eppley only used the information obtained from the query on the Sonic and his memory to write his report.  (*Id*. at 22.)  He had no other information available to him when he wrote the report.  (*Id*.)  Agent Eppley agreed with counsel that it is "not always" best practice to write a report ten months after an incident.  (Hr'g Tr. 5/20/2024 at 24, Doc. 108.)  However, he explained that he would not have written a report regarding the TECS entry if he had not been asked to do so by the U.S. Attorney's Office.  (*Id*.)  There are no specific guidelines that agents must follow in making a TECS entry.  (*Id*.)  Agent Eppley agreed that the TECS entry can be based on "very little information," and possibly incorrect information.  (*Id*. at 25.)

Agent Eppley again testified that on February 15, 2023, he observed the Sonic pull out from a motel parking lot onto Grand Avenue.  (*Id*.)  He did not see if the driver was

male or female and did not see if there were passengers in the back seat. (Hr'g Tr. 5/20/2024 at 25, Doc. 101.) He also did not know if the driver was staying at the motel and is not completely certain of the motel the Sonic exited. (*Id.* at 25, 30.) He did not know when the Sonic arrived or how long it was at the motel. (*Id.* at 30.) Agent Eppley did not have specific information about suspected undocumented immigrants staying at the motel. (*Id.* at 30.) However, he added that agents had been targeting the motels for about a month. (*Id.*)

Agent Eppley agreed that there are "a myriad of reasons for which a person might want to stay at a motel" that are unrelated to alien smuggling. (Hr'g Tr. 5/20/2024 at 26, Doc. 101.) He also agreed that even though a vehicle is registered out of Tucson, that does not mean the owner lives in Tucson. (*Id.* at 27.)

Agent Eppley agreed that his report does not include the time of day he encountered the Sonic; however, he testified that "[i]t was daylight." (*Id.* at 26.) He also did not note that he was 10 to 20 yards from the Sonic or if he was stationary or moving when he saw the Sonic. (*Id.* at 27.)

Agent Eppley testified that license plate reader information shows that on February 14, 2023, the Sonic crossed the Tombstone checkpoint. (*Id.*) License plate information is captured even if the checkpoint is not operational. (Hr'g Tr. 5/20/2024 at 28, Doc. 108.) Agent Eppley does not know if the Tombstone checkpoint was operational on February 14, 2023. (*Id.*) As a result, he did not and does not know if the Sonic was searched or detained on that day. (*Id.*)

After the Sonic left the motel and Agent Eppley entered the Sonic's license plate number into Mobile Query, it took "a few minutes" to get the results. (*Id.* at 28–29.) He explained that it can take a while to get the information depending on whether an agent is already logged into the system. (*Id.* at 29.)

Agent Eppley does not make a TECS entry on every car that he does not recognize. (Hr'g Tr. 5/20/2024 at 30, Doc. 108.) However, he would make a TECS entry for a vehicle pulling out on Grand Avenue if he had "other articulable facts." (*Id.*) With respect to the

TECS entry for the Sonic, it was based on the vehicle leaving the motel and the information obtained from Mobile Query – *i.e.*, the prior day the Sonic passed the checkpoint near Tombstone.  (*Id*. at 32.)  Agent Eppley had no other information to suggest that the Sonic was being used to transport illegal aliens.  (*Id*. at 33.)  He agreed that his notation in the TECS entry does not say that he "suspected" that the Sonic was transporting illegal aliens.  (*Id*.)

Agent Eppley did not initially write a report regarding the TECS entry for the Sonic because he if wrote a report on every entry he "would never get to the field[.]"  (Hr'g Tr. 5/20/2024 at 34, Doc. 101.)  He agreed that reports are important because other agents may rely on them in the future.  (*Id*.)  He also agreed that a TECS hit alone "is never a reason to stop a vehicle.  Somebody would have to couple that with articulable facts."  (*Id*.)

There are cameras at every checkpoint within the Tucson Area of Responsibility, which includes the checkpoints in Douglas, Naco, Sonoita, Tucson, Nogales, Three Points, Ajo, and Tombstone.  (*Id*. at 34–35.)  The Mobile Query will reveal if a vehicle passed through those checkpoints.  (*Id*. at 35.)  However, if a vehicle is stopped or searched at a checkpoint, that information would not be noted and revealed by Mobile Query.  (Hr'g Tr. 5/20/2024 at 35, Doc. 108.)  Mobile Query would reveal if there was a seizure at a checkpoint.  (*Id*.)

Re-direct examination:

The time it took to obtain the results of the Mobile Query spanned from when Agent Eppley got into the system until he received the information from the system.  (*Id*. at 36.)  In response to counsel's question of how quickly the Mobile Query system generates results, Agent Eppley testified:  "It depends on the day.  It can really lag sometimes.  Other times, it's almost instantaneous."  (*Id*. at 37.)  Mobile Query is an application on Agent Eppley's cell phone.  (*Id*. at 38.)  "When a vehicle passes through a checkpoint and is caught on a camera that is located at that checkpoint" the sighting of the vehicle is reflected in Mobile Query.  (Hr'g Tr. 5/20/2024 at 38, Doc. 108.)  Again, that occurs regardless of whether the checkpoint is operational.  (*Id*.)

When Agent Eppley wrote his report in November 2023, he was able to recall the encounter with the Sonic on February 15, 2023, because when he ran the registered owner, Hailey Sternella, the name stuck out to him.  (*Id*. at 38.)  He explained that "it wasn't a name I'd ever seen before.  And for some reason, my brain is one of those ones that just always tries thinking hey, what nationality is that?" (*Id*.)  Agent Eppley again testified that he does not write a report every time he places a TECS alert on a vehicle.  (*Id*. at 39.)  He would have written a report if he stopped or searched the vehicle.  (Hr'g Tr. 5/20/2024 at 39, Doc. 108.)

Victor Valdez:

Mr. Valdez works as an investigator for the Federal Public Defender's Office in Tucson, Arizona.  (*Id*. at 46–47.)  His prior work experience includes "three years at the U.S. Embassy Kabul Afghanistan Technical Operations Center, some contract work with the FBI and Border Patrol, and eight years as a military police officer.  (*Id*. at 46.)

Mr. Valdez's testimony primarily pertained to the tint on the windows of the Sonic.  Mr. Valdez verified that Arizona law does not restrict the darkness of the tint on the rear windows of vehicles.  (*Id*. at 52, 65–66.)  For the front windows, at least 33–35% of light must pass through.  (*Id*. at 69.)  He used a Tint Meter Enforcer to test the tint on the windows of the Sonic.  (Hr'g Tr. 5/20/2024 at 50–51, Doc. 108.)  This device revealed that front windows of the Sonic allowed between 71–75% of light to pass through and the rear windows allowed around 4% of light to pass through.  (*Id*. at 51–52.)  Mr. Valdez testified that he could see through the tinted windows; however, he was only two to three feet away from the windows.  (*Id*. at 80.)

## **DISCUSSION**

A law enforcement officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlaw*, 528 U.S. 119, 123 (2000).  This standard is less demanding than a showing of probable cause, and merely requires "a minimal level of objective justification." *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir.

2022).  Investigatory stops are valid only if the suspicion is objectively reasonable. *Navarette v. California*, 572 U.S. 393, 396 (2014).  An officer's subjective intentions are irrelevant to the constitutionality of an investigatory stop under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 811–13 (1996).

To determine whether a stop was supported by reasonable suspicion, a court "consider[s] whether, in light of the totality of the circumstances, the officer had a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *United States v. Palos-Marquez*, 591 F.3d 1272, 1274–75 (9th Cir. 2010) (*quoting United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007)). "Reasonable suspicion 'is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'"  *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (*quoting United States v. Rojas-Millan*, 234 F.3d 464, 468–69 (9th Cir. 2000)).

The primary bases for reasonable suspicion are an officer's personal observations and the officer's knowledge obtained or imputed from others that a crime has been committed.  *See Utah v. Strieff*, 136 S. Ct. 2056, 2063 (2016); *Navarette*, 572 U.S. at 397–98.  Although an officer may not base his reasonable suspicion on a "hunch," he may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available . . . that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  For that reason, courts afford considerable deference to the observations and conclusions of law enforcement officers, reasoning that an experienced officer can infer criminal activity from conduct that may seem innocuous to a lay observer.  *See Arvizu*, 534 U.S. at 277.

Furthermore, the Supreme Court has rejected a "divide-and-conquer" reasonable suspicion analysis in which each individual factor is given no weight because it is susceptible to an innocent explanation.  *Arvizu*, 534 U.S. at 274.  In fact, several apparently innocent activities taken together may amount to reasonable suspicion.  *United States v.*

*Sokolow*, 490 U.S. 1, 3, 9 (1989); *D.C. v. Wesby*, 138 S. Ct. 577, 588–89 (2018) (reasonable suspicion existed in totality of circumstances though each consideration in isolation could be explained by innocent reason).  As a result, in reviewing whether reasonable suspicion is present, courts must consider the evidence as a whole, not piece by piece.  *United States v. Villasenor*, 608 F.3d 467, 473 (9th Cir. 2010).

The Supreme Court has identified a nonexclusive list of factors to consider in determining whether reasonable suspicion exists for a stop made near an international border.  These include: (1) the characteristics of the area in which a vehicle is stopped; (2) the proximity to the border; (3) usual traffic patterns on the particular road; (4) the officer's previous experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive driving behavior; (7) aspects of the vehicle; and (8) the behavior or appearance of the driver.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–85 (1975).  As discussed below, these factors and historical information regarding the vehicle at issue, in combination, establish that Agent Gonzales had reasonable suspicion for the stop.

*Aspects of the vehicle:*

The Sonic was registered out of Tucson, which is an hour from Sonoita.  Agent Gonzales testified that in his experience many vehicles that transport undocumented aliens that he has encountered in the Sonoita area were registered out of Tucson or Phoenix.  While the registration of the Sonic out of Tucson, standing alone, is innocuous, that fact coupled with Agent Gonzales' experience with alien smugglers and the facts detailed below weighs in favor of a finding of reasonable suspicion.

The defendant's rear passenger windows were heavily tinted, making it impossible for Agent Gonzales to see whether anyone was in the backseat.  Although Arizona law does not restrict the darkness of tint on a vehicle's back windows, Agent Gonzales testified that it is common for alien smugglers to use vehicles whose rear windows are heavily tinted to prevent law enforcement from seeing individuals in the rear seats.  Moreover, he testified that it is uncommon to see the stark contrast between the front and rear tint that was present on the Sonic.  That fact is also indicative of alien smuggling.  Thus, once again, while there

is an innocent and reasonable explanation for dark tinting on the rear windows of a vehicle, the Sonic's dark tint on the rear windows weighs in favor of reasonable suspicion based on other facts and Agent Gonzales' experience.

*The proximity to the border, the characteristics of the area, and Agent Gonzales' previous experience with alien smuggling traffic in this area.*

Agent Gonzales was familiar with the local traffic in Sonoita and did not recognize the Sonic as belonging to a local resident. The defendant was driving eastbound on SR 82 through the town of Sonoita which is located 32 miles from the international border. SR 82 begins in Nogales, Arizona and connects with SR 80, near Tombstone, Arizona, which continues north to I-10 towards Tucson and Phoenix. The defendant had passed the turn-off for SR 83, which is the most direct route to Tucson from Sonoita. Driving from eastbound on SR 82 to SR 80 adds about 25–30 minutes to the trip. Agent Gonzales testified that in his experience this is a common alien smuggling route to avoid the checkpoints on Interstate 19, SR 83, and SR 90. The defendant's route of travel was even more indicative of alien smuggling because the checkpoint on SR 80 had been closed for months prior to February 20, 2023. Agent Gonzales testified that it is common for alien smugglers to travel through unmanned checkpoints to avoid detection. In fact, Border Patrol agents had seen an increase in alien smuggling traffic on SR 82 toward SR 80 because of the unmanned checkpoint on SR 80. Based on Agent Gonzales' experience, these facts support a finding of reasonable suspicion.

*Historical Facts about the Sonic*:

The Mobile Query run by Agent Gonzales on February 20, 2023, revealed that the Sonic had travelled northbound through the unmanned checkpoint on SR 80 three times in the last week. Agent Gonzales testified that this crossing history was indicative of the Sonic trying to evade the manned checkpoints on I-19, SR 83, and SR 90 (the more direct routes to I-10 and the Tucson and Phoenix areas), which is a common tactic used by alien smugglers.

Agent Gonzales also learned from dispatch that the Sonic was sighted by law

enforcement cameras in Casa Grande earlier in the day.[2]  Agent Gonzales testified that individuals who smuggle aliens often travel from the Tucson and Phoenix area to pick up the aliens near the border and transport the aliens to Tucson or Phoenix the same day.

Finally, Agent Gonzales learned of a TECS alert on the Sonic which stated that the Sonic was being used to transport illegal aliens into the interior of the United States.  The defense argues that the TECS alert should not be considered in the reasonable suspicion analysis because the information used to create the alert was inaccurate, and therefore, unreliable.  Specifically, the agent who created the TECS alert on February 15, 2023, Agent Eppley, had no facts that to conclude that the Sonic was smuggling aliens on that day.  The only information that Agent Eppley had was that the Sonic pulled onto Grand Avenue in Nogales from the parking lot of a motel that is commonly used to harbor illegal aliens.  Agent Eppley did not see anyone get into the Sonic and did not see the driver of the Sonic or any other occupant of the car.  As a result, the defense argues, Agent Eppley's TECS entry incorrectly stated that the Sonic was being used to transport illegal aliens.  At most, Agent Eppley merely had a suspicion that the Sonic was being used to transport illegal aliens, and his TECS entry should have only detailed his suspicion.

The Court agrees the factual narrative in Agent Eppley TECS entry would have been more accurate if he made clear that he "suspected" that Sonic was engaged in alien smuggling.  However, Agent Eppley's failure to detail that he only had a "suspicion" that the Sonic was involved in alien smuggling is of no consequence to the analysis of whether Agent Gonzales had reasonable suspicion to stop the Sonic.  The Court reaches that conclusion for two reasons.

First, "a mere mistake of fact will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot."

---

[2] The time when the Sonic was sighted in Casa Grande – at 2:00 p.m. or earlier in the day – does not impact the reasonable suspicion analysis.  The dispatch recording makes clear that the Sonic was in Casa Grande the day of and prior to the stop.  Moreover, the inability to find the email that Agent Gonzales referred to during his testimony (to the extent it ever existed) does not negatively impact his credibility.

1    *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2022).  By contrast, reasonable

2    suspicion cannot be premised on a mistaken understanding of the law.  *United States v.*

3    *Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2002) (officer had mistaken belief defendant was

4    violating California law by displaying only one license plate).

5        In *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013), the Ninth Circuit

6    found that officers had reasonable suspicion to search the defendant's laptop when he

7    entered the United States at a Port of Entry even though that suspicion was based on

8    mistaken facts.  Specifically, an officer was told by those in charge of administering the

9    TECS database that the officer should search the defendant's laptop because he appeared

10   to have been involved in some type of child pornography.  *Cotterman*, 709 F.3d at 968.

11   An agent also looked up the defendant's criminal record and understood that he had a prior

12   conviction for child pornography.  *Id.*  As it turned out, the defendant's prior conviction

13   "was not for pornography, but for child molestation."  *Id.*  The court found the search to be

14   valid, holding that law enforcement's "understanding of the objective facts, albeit

15   mistaken, is the baseline for determining reasonable suspicion."  *Id.*

16       Similarly, in *United States v. Dorais*, 241 F.3d 1124, 1130–31 (9th Cir. 2001), the

17   Ninth Circuit found that an officer had reasonable suspicion for a stop that was based on

18   mistaken information from a rental car company that the car was stolen.  The court also

19   rejected the defendant's argument that the officers had an affirmative duty to determine

20   whether the car was in fact stolen.  *Dorais*, 241 F.3d at 1131.  The court reasoned that the

21   officer had reasonable suspicion to stop the car because the officer was acting on a police

22   report from the rental car company "whose honesty ha[d] not been questioned[.]"  *Id.*

23       Here, Agent Gonzales was arguably relying on mistaken information – that Agent

24   Eppley had seen the Sonic smuggling aliens on February 15, 2023.  But, as in *Cotterman,*

25   Agent Gonzales' "understanding of objective facts, albeit mistaken, is the baseline for

26   determining reasonable suspicion."  709 F.3d at 968.  Moreover, as in *Dorais,* Agent

27   Eppley did not have an affirmative duty to determine whether the Sonic had in fact been

28   used to smuggle illegal aliens.  To be sure, unlike in *Dorais*, the defense has questioned

the honesty of Agent Eppley's TECS entry; however, the Court declines to find that Agent Eppley was dishonest in making his TECS entry.  In fact, the Court finds Agent Eppley's testimony credible.  The narrative in his TECS entry was clearly based on inferences drawn from his experience with alien smuggling generally and the use of the motels in Nogales at the border to harbor illegal aliens.  Agent Eppley could have been more precise in terms of his suspicion that Sonic was involved in alien smuggling; but his lack of precision does not rise to the level of dishonesty.

Second, and perhaps more importantly, if the TECS entry had stated that Agent Eppley merely had a "suspicion" that the Sonic was involved in alien smuggling, that information would still weigh in favor of a finding that Agent Gonzales had a reasonable suspicion to stop the Sonic.  In fact, even if Agent Eppley had not included his conclusions in his TECS entry about the Sonic's involvement or suspected involvement in alien smuggling and had just detailed what he knew on February 15, 2023 – *i.e.*, the Sonic was registered out of Tucson; it had crossed through the unmanned checkpoint on SR 80 near Tombstone the prior day; he and other agents had been conducting surveillance at the motel in Nogales, Arizona because they are routinely used to harbor illegal aliens; and the Sonic pulled out of a motel parking lot onto Grand Avenue – those facts would weigh in favor of a finding that Agent Gonzales had reasonable suspicion to stop the Sonic.

*Erratic or evasive driving behavior*:

The Sonic was swerving within its lane of travel and travelling 20–25 miles below the speed limit.  Agent Gonzales testified that this driving behavior suggested to him that the driver was not familiar with the area and/or was nervous.

When Agent Gonzales activated his vehicle's emergency lights and sirens while following the Sonic, the driver did not immediately pull over to the side of the road and stop.  Rather, the driver pulled to the shoulder of the road, slowed down, and waved at Agent Gonzales to pass him.  That driving behavior continued for about a quarter of a mile. Agent Gonzales testified that it is uncommon for drivers who are not engaging in illegal activity to continue driving and wave for a law enforcement vehicle with lights and sirens

activated to pass.

Although there was not much testimony on this point, the driver of the Sonic tried to flee from Agent Gonzalez.  Specifically, after the driver finally stopped the vehicle and Agent Gonzales was at the front driver's door, the driver began driving and drug Agent Gonzales "down the road about 50 yards" until he was able to turn off the vehicle.  (Hr'g Tr. 5/7/2024 at 41, Doc. 101.)  Thus, even if there was not reasonable suspicion for the initial stop, the driver's attempted flight, both alone and in combination with the other factors identified above, provided reasonable suspicion that criminal activity was afoot.

## CONCLUSION

Based on the totality of the circumstances discussed above, the Court concludes that there was reasonable suspicion to stop the defendant's vehicle.  The Court finds that Agent Gonzales and Agent Eppley were credible witnesses.  The Court further finds that Agent Gonzales's testimony regarding the timeline of events, his observations of the suspect vehicle, as well as his understanding regarding the information received from other sources, was credible and sufficient to create a reasonable suspicion that criminal activity was afoot.  As a result, it is recommended that the district court deny the defendant's Motion to Suppress.

## RECOMMENDATION

Accordingly, the Magistrate Judge recommends that the District Judge enter an order **DENYING** Defendant's Amended Motion to Suppress Evidence for Violation to the 4th Amendment Lack of Reasonable Suspicion (Doc. 73).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  In light of the abbreviated time before trial, **objections shall be due on or before June 19, 2024**.  A party may respond to another party's objections, **any responses to objections shall be due on or before June 24, 2024**.  No reply shall be filed unless leave is granted from the District

Court.  If objections are filed, the parties should use the following case number: **CR-23-00389-TUC-JCH**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 12th day of June, 2024.

Eric J. Markovich
United States Magistrate Judge